IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Deborah Donovan, ) | |
| ) | C.A. No. 6:05-217-HMH |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **OPINION AND ORDER** |
| Eaton Corporation Long Term Disability ) | |
| Plan, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court for review of the Eaton Corporation Long Term Disability Plan ("Plan") administrator's decision to deny long-term disability ("LTD") benefits to Deborah Donovan ("Donavan") under a plan governed by ERISA.[1]  Donovan seeks benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) and attorney's fees and costs pursuant to 29 U.S.C.§ 1132(g).  (Joint Stipulation ("J.S.") ¶ 1.)  The parties have filed a joint stipulation and memoranda in support of judgment pursuant to the court's Specialized Case Management Order for ERISA benefits cases.  The parties agree that the court may dispose of this matter consistent with the joint stipulation and memoranda.  (J.S. ¶ 8; Pl.'s Mem. Supp. J. 2.)

However, the parties disagree as to (1) the appropriate standard of review; and (2) whether the Plan's claims administrator, Eaton Corporation ("Eaton"), "abused its discretion, under the appropriate standard of review," in denying Donovan LTD benefits.  (J.S. ¶ 7;

---

[1]Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

1

Def.'s Reply Pl.'s Mem. Supp. J. 2.) For the reasons below, the court finds that the modified abuse of discretion standard applies, and under that standard, Eaton abused its discretion in denying Donovan LTD benefits because there is no substantial evidence to support the finding that Donovan was unable to perform any occupation on March 1, 2004.

### I. FACTUAL AND PROCEDURAL HISTORY

Until 1993, Donovan worked for Eaton in Greenville, South Carolina as an in-put shaft operator. (R. 222 (Donovan Aff. ¶ 5).) In 1993, Donovan quit working because of degenerative disc disease and chronic back pain. (Id. (Donovan Aff. ¶¶ 5, 6).) At that time, she filed a claim for LTD benefits, and the Plan paid her LTD benefits for ten years. (Id. (Donovan Aff. ¶ 6).) The Plan is self-insured and administered by Eaton. (Def.'s Mem. Supp. J. 1.) Broadspire Services, Inc. ("Broadspire") is the Plan's claims administrator hired by Eaton to process and review disability claims and decide initial appeals of the denial of disability benefits. (R. 8.)

Broadspire periodically reviews a claimant's entitlement to benefits. In February 2004, Broadspire denied Donovan's claim for disability benefits alleging that there was "insufficient objective clinical documented [sic] to support a level of functional impairment that would render [Donovan] unable to perform any occupation." (Id. 188.)

The relevant Plan language is as follows:

> You are considered to have a covered disability (see "Disabilities NOT Covered" for exceptions) under the Plan if:
> During the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which you are, or may become, reasonably well fitted by reason of education, training or experience – at Eaton Corporation or elsewhere.

2

(J.S. ¶ 6.) Prior to the denial, Donovan submitted the June 15, 2003, statement of her treating physician, Dr. Larry Smith ("Dr. Smith"), which indicated that she had low back pain and leg pain and was disabled. (R. 144-45.) In addition, Donovan provided evidence that she was approved for Social Security disability benefits. (Id. 148-49.) Donovan also submitted her own statement that she had undergone four back surgeries to repair herniated disks. (Id. 149.) Medical records were also presented to support her claim. (Id. 154-62.)

Further, Donovan voluntarily underwent a functional capacity evaluation ("FCE") in December 2003, which reflected that she could perform light work for eight hours a day. (Id. 316-21.) In addition to the information submitted by Donovan, Broadspire reviewed Donovan's medical records and concluded that her condition had improved. Specifically, Broadspire relied on Dr. Smith's medical records dated May 3, 2000, December 27, 2001, April 16, 2002, August 6, 2002, and July 24, 2003, indicating that Donovan was doing well, was improving, and had no significant complaints or problems. (R. 108, 127, 128, 118, & 129.) Further, Donovan stated in Eaton's long-term disability questionnaire dated March 28, 2001, that she was able to bathe, walk, and dress herself. (Id. 133-34.) On June 12, 2003, she stated in a resource questionnaire that she was able to perform back exercises and drive to the store and doctor's office. (Id. 150-53.)

Dr. Tamara Bowman ("Dr. Bowman"), a Broadspire in-house peer reviewer specializing in internal medicine, reviewed Dr. Smith's records from April 2002 to September 2003, the resource questionnaire, and Dr. Smith's July 15, 2003, statement. In her review dated December 10, 2003, Dr. Bowman concluded that there were insufficient objective clinical findings to support the conclusion that Donovan was unable to perform any

3

occupation. (Id. 184-86.)  Specifically, Dr. Bowman found that "although the claimant is noted to have low back and leg pain, there was no documentation of objective muscle weakness, signs of radiculopathy, abnormal gait-joint deformity or effusion or synovitis. There is no evidence of any radiographic abnormalities, and no evidence of a herniated disc or spinal canal stenosis."  (Id. 185.)

Broadspire issued a denial letter on February 10, 2004, indicating that, based on an employability assessment report, Donovan could work as a claims clerk, waitress, and counter attendant in a cafeteria.  (R. 187-90.)  On April 20, 2004, Donovan requested an appeal of her claim.  (Id. 191.)  She supplemented the record with medical records from Dr. John A. Welshofer ("Dr. Welshofer") of Total Spine Specialists dated March 4, 2004, indicating that examination and x-rays of her lumbar spine revealed that she suffered from "probable chronic permanent lumbar radiculopathy, severe lumbar degenerative disc disease status post surgery X4, [and] cervical degenerative disc disease."  (Id. 193.)  Further, she provided a statement dated April 4, 2004 ("April 2004 statement"), from Dr. Welshofer that there was "objective evidence of chronic radiculopathy on electrodiagnostic testing."  (Id. 235.)  Dr. Welshofer further stated that Donovan could not lift, pull, push or carry more than 10 pounds, could perform occasion bending, could perform "[n]o stooping, squatting, kneeling or repetitive motion about the lumbar spine," could only stand, sit or walk for 15 or 20 minutes at a time without changing positions or resting, and that she would require intermittent leaves of absences from work for physical therapy and steroid injections.  (Id.)  In sum, Dr. Welshofer concluded that Donovan could only perform a sedentary occupation with the above-listed limitations.  (R. 235)

4

Dr. Martin Medelssohn ("Dr. Medelssohn"), another Broadspire in-house peer reviewer specializing in orthopedic surgery, concluded in his review on May 28, 2004, that Donovan was not precluded "from performing any occupation effective 03/01/04 provided it is sedentary in nature with restrictions as outlined by her treating physician." (Id. 202.) Dr. Medelssohn found that there was no evidence of peripheral neuropathy or other nerve damage. (Id. 202.) As such, on June 3, 2004, Broadspire denied Donovan's claim again on appeal, concluding that there was insufficient objective medical evidence to support a finding that Donovan was entitled to LTD benefits. (Id. 204-06.)

On June 21, 2004, Donovan filed a second appeal. (Id. 208-09.) She submitted an affidavit outlining her subjective complaints and a statement about her daily activities. (R. 222-28.) In her affidavit she stated:

> The pain and discomfort which I suffer is completely distracting and is unbearable on most days. I suffer from chronic pain in my neck, back, and legs. Also, because of the profound fatigue which plagues me I cannot even perform those tasks which I can do for any extended period of time. I have difficulty sleeping and my inability to sleep at night also contributes to my severe fatigue. When I get up in the morning I begin to deal with my pain and when I go to bed in the evening I am still dealing with it. I deal with the pain and discomfort all day, every day. By the afternoon I am so exhausted that I am forced to take a nap for several hours to cope with the pain and discomfort. I cannot sit, stand, or walk for any period of time without having to change positions because of the severe pain from which I suffer in my neck, back, and legs. It is my hope that one day I will receive relief from the problems which I suffer, but right now dealing with my problems is a full-time endeavor, in and of itself, and I cannot imagine that I could work at any job. Additionally, the foregoing description describes me on a good day. On a bad days [sic] I may be "laid up" for the whole day and the bad days occur quite frequently.

(Id. 223-24 (Donovan Aff. ¶ 8).) Further, Donovan challenged the FCE's conclusion that she was able to work eight hours a day on the basis that the FCE only lasted several hours, and she was unable to do anything the next day because she was sore. (Id. 224-25 (Donovan Aff.

5

¶ 11).) As such, she alleged that the FCE only established that on a good day she can perform certain tasks. (Id.)

In addition, Donovan provided an electrodiagnostic report dated July 22, 2004, indicating that she suffered from "mild to moderate right median nerve entrapment at the wrist and mild R C6 radiculopathy." (Id. 229-30.) Further, she submitted July 2004 radiology reports, and Dr. Welshofer's notes indicating that she had radiating symptoms down her arm and paresthesias. (R. 231, 238.) The July 13, 2004, MRI of Donovan's cervical spine found "moderate to marked degenerative changes of the cervical spine most prevalent at C5-6 resulting in mild spinal cord compression." (Id. 231.) As a result of the July 2004 findings, Dr. Welshofer referred Donovan to a surgeon, Dr. Robert E. Lins ("Dr. Lins"), for evaluation on July 22, 2004. (Id. 239.) In addition to Dr. Welshofer's notes, Donovan submitted Dr. Lins' notes indicating that Donovan's MRI of July 13, 2004, found marked spinal canal stenosis at C5-C6. (Id. 342.)

On August 17, 2004, Donovan submitted Dr. Welshofer's affidavit in which he opined that as a result of Donovan's condition, Donovan has been totally disabled since 1993 and could not perform any job on a full-time basis. (Id. 312-315 (Welshofer Aff. ¶ 9).) In addition, Dr. Welshofer declared that the FCE was not "an accurate indicator of [Donovan's] ability to work on a consistent basis or her disability." (R. 314 (Welshofer Aff. ¶ 8).)

Dr. James Wallquist ("Dr. Wallquist"), a third Broadspire in-house peer reviewer specializing in orthopedic surgery, concluded in a review dated August 20, 2004, that residual cervical and lumbar radiculopathy were not sufficient objective findings to support the conclusion that Donovan could not perform any occupation in light of the FCE and Dr.

6

Welshofer's April 2004 statement. (Id. 323-25.) Dr. Wallquist noted in his review that Dr. Smith did not perform a neurological exam, and that Donovan's pain was not quantified. (R. 325.) In addition, Dr. Wallquist stated that Dr. Smith's notes were silent regarding any "spasms or gait analysis or tension signs." (Id.)

On September 24, 2004, Donovan underwent "C4-C5 and C5-C6 anterior cervical diskectomies and foraminotomies, placement of interbody device at C4-C5 and C5-C6 with Cornerstone allograft and anterior cervical plating . . . at C4-C5 and C5-C6." (Id. 345.) Dr. Wallquist's final conclusion after reviewing the medical records concerning Donovan's surgery was that "the documentation would not support a functional impairment that would preclude this claimant from engaging in any occupation from 3/01/04 through 9/22/04 prior to cervical surgery. The documentation would support impairment from any occupation, from 9/23/04 through the present, while recovering from cervical surgery." (Id. 351.)

An independent orthopedic surgeon who reviewed Donovan's records for Broadspire found in a December 20, 2004, report that there was no evidence that Donovan could not perform any occupation as of March 1, 2004, when the denial of her disability benefits was effective. (R. 68-75.) Eaton denied Donovan's second appeal and issued a final denial letter on January 11, 2005. (Id. 53.) Eaton stated in its final review that

> The determination to deny Ms. Donovan's appeal and entitlement to continued long term disability benefits under the Disability Plan is based on the definition of disability in the Long Term Disability Program, the need for objective findings to support a finding of disability, a review of Ms. Donovan's medical records, and the conclusion of the independent medical professional retained by the Plan Administrator to assist in making this determination.

(Id. 63) This litigation ensued.

7

## II. DISCUSSION OF THE LAW

### A. Standard of Review

The parties dispute the applicable standard of review. The Plan argues that the appropriate standard is abuse of discretion, which provides that the administrator's "discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 341 (4th Cir. 2000); (Def.'s Reply Pl.'s Mem. Supp. J. 2.). Donovan argues that a modified abuse of discretion standard applies because Eaton was operating under a conflict of interest. (Pl.'s Mem. Supp. J. 14-15.)

Under the terms of the Plan, Eaton has discretionary authority. (R. 67.) "[W]hen an administrator . . . with discretion is operating under a conflict of interest such that its decision to award or deny benefits impacts its own financial interests, the conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." Bernstein v. CapitalCare Inc., 70 F.3d 783, 787 (4th Cir. 1995) (internal quotation marks omitted); see Bedrick v. Travelers Ins. Co., 93 F.3d 149, 152 (4th Cir. 1996) ("Inasmuch as the law is highly suspect of fiduciaries having a personal interest in the subject of their trust, the abuse of discretion standard is not applied in as deferential a manner to such plans.") (internal quotation marks omitted).

Donovan argues that Eaton was operating under a conflict of interest because it is both the funder and administrator of the Plan. See Bynum v. CIGNA HealthCare of North Carolina, Inc., 287 F.3d 305, 313 (4th Cir. 2002) (finding that a conflict of interest existed because the insurance company administered the plan and also insured the plan); Holder v.

8

Woodmen of the World, No. 00-2410, 2001 WL 369680, at *1 (4th Cir. Apr. 13, 2001) (finding that a conflict of interest exists when a plan is self-funded) (unpublished).[2] Eaton has a financial interest in whether Donovan's claim is approved because the Plan is self-funded. As such, the court finds that Eaton was operating under a conflict of interest.

"[T]he court modifies [the] abuse of discretion standard according to a sliding scale." Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997). "The more incentive for the administrator . . . to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator['s] . . . decision must be and the more substantial the evidence must be to support it." Id. The Plan submitted the affidavit of James Hrivnak, the manager of benefits, design, and strategy at Eaton, who states that Eaton offers no incentive, either in compensation or performance reviews, to approve or deny claims for benefits. (Def's Reply Pl.'s Mem. Supp. J Ex. A (Hrivnak Aff. ¶ 6).) However, Eaton has a financial incentive, as funder of the Plan, in whether claims are approved or denied. Therefore, in light of the conflict of interest, Eaton's decision is entitled to reduced deference. As such, the decision to deny Donovan's benefits must be examined closely to determine whether Eaton's decision was objectively reasonable and supported by substantial evidence. "Substantial evidence . . . is evidence which a reasoning mind would accept as sufficient to support a particular conclusion . . . [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v. Westinghouse Elec. Coop.,

---

[2]The court recognizes that, absent unusual circumstances, the citation of unpublished opinions of the Fourth Circuit is disfavored. See U.S. Ct. App. 4th Cir. Rule 36(c). However, because there is no published opinion in the Fourth Circuit on point, the court believes its reference to the above-mentioned cases is relevant and appropriate.

747 F.2d 197, 208 (4th Cir. 1984), abrogated on other grounds by de Nobel v. Vitro Corp., 885 F.2d 1180 (4th Cir. 1989).

### B.  Denial of LTD Benefits

The Plan argues that the "Administrative Record provides substantial evidence, including Plaintiff's treating physician's statements, Plaintiff's own statements, three peer reviews, and a physician review, which supports the conclusion that as of March 2004, Plaintiff was no longer disabled.  At that moment, Eaton was justified in terminating Plaintiff's LTD benefits." (Def.'s Reply Pl.'s Mem. Supp. J. 1.)  The court disagrees. "[W]hile an administrator does not necessarily abuse its discretion by resolving an evidentiary conflict to its advantage, the conflicting evidence on which the administrator relies in denying coverage must be 'substantial'--especially when . . . the administrator has an economic incentive to deny benefits."  Stup v. Unum Life Ins. Co. of America, 390 F.3d 301, 308 (4th Cir. 2004).

The Plan argues that Dr. Smith's notes from 2000 to 2003 state that Donovan was improving and had no complaints.  (R. 108, 118, & 127-29.)  However, those notes do not indicate that Donovan had improved such that she could work a full-time job.  (Id.)  Instead, they are completely silent regarding Donovan's ability to work in any capacity.  As such, Dr. Smith's notes are not substantial evidence that Donovan was not disabled.

The Plan also relies heavily on Dr. Welshofer's April 2004 statement that Donovan could perform sedentary work with certain limitations to support its decision to deny LTD benefits.  (Id. 187-90.)  Dr. Welshofer's April 2004 statement contradicts his affidavit, wherein he stated that Donovan had been completely and totally disabled since 1993.

10

(Id. 312-15.) However, Dr. Welshofer's April 2004 statement was made without complete information regarding Donovan's condition. In addition to Donovan's severe low back problems, Dr. Welshofer discovered in July 2004 that Donovan had cervical back problems which caused Donovan pain in her neck and right arm. Donovan's July 2004 radiology reports revealed that she had stenosis, spinal cord compression, right median nerve entrapment in her wrist, and R C6 radiculopathy. (Id. 230-31.) As such, his affidavit is entitled to substantially greater weight than his April 2004 statement, which was based on incomplete information.

> In his affidavit, Dr. Welshofer states:
>
> It is my opinion, based upon my medical education and experience and based upon my specific knowledge of Ms. Donovan's problems and treatment history that she is and has been completely and totally disabled from performing any job on a full-time basis, consistent with the definition of disability above and consistent with my knowledge of Ms. Donovan's training, education, and experience. I render my opinion based upon the cumulative effect of Ms. Powell's [sic] above described physical problems and the subjective symptoms she suffers. It is my opinion that she has been so disabled since she ceased working in 1993 and that she will remain so indefinitely into the future.

(R. 314-15 (Dr. Welshofer Aff. ¶ 9).) The Plan alleges that Dr. Welshofer's affidavit lacks any objective evidence to support his opinion that Donovan is completely and totally disabled. Donovan contends that this is inaccurate because, in fact, Dr. Welshofer amended his opinion in the affidavit as a direct result of the July 2004 objective medical tests. (Def.'s Mem. Supp. J. 13.) While Dr. Welshofer's affidavit does not specifically outline the objective evidence, it unequivocally states that his opinion is based on his knowledge of Donovan's problems and treatment history. (R. 314-15 (Dr. Welshofer Aff. ¶ 9).)

11

Although plan administrators are not required to give a treating physician's opinion any special weight, a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). In Holder v. Woodmen of the World, the United States Court of Appeals for the Fourth Circuit held that the district court erred in granting summary judgment for an ERISA plan where a treating physician initially sent a letter indicating that the claimant could work in a sedentary position but several months later the doctor stated that the claimant was "totally disabled from working full-time or on a consistent basis and had been since her car accident." 2001 WL 369680, at * 2.

The Fourth Circuit found that

> [i]n light of the fact that the more recent evidence supports a finding that [the claimant] suffered from a total disability and that the only evidence to the contrary was an initial letter from [the claimant's] treating physician who later concluded that [the claimant] had reached maximum recovery and was totally disabled, we find that summary judgment in favor of the Plan was not appropriate.

Id. at *2; see also Mitchell v. Fortis Benefits Ins. Co., No. 04-2307, 2005 WL 1793641, at *8 (4th Cir. 2005) (affirming the district court's finding that the plan abused its discretion in denying LTD benefits to a claimant where initially the claimant's treating physician stated that the claimant could perform light duty work with limitations, but after discovering that the claimant had moderate degenerative joint disease of the hip, the treating physician opined that the claimant was unable to "maintain gainful employment without significant increase in pain symptoms making him totally non-functional.") (unpublished). The court finds that the Plan's wholesale disregard of Dr. Welshofer's affidavit in favor of his earlier April 2004 statement,

which was based on incomplete information, is unreasonable. Obviously, it was impossible for Dr. Welshofer to consider the July 2004 radiology reports in formulating his April 2004 statement. As such, in light of Dr. Welshofer's affidavit, his April 2004 statement is not substantial evidence of Donovan's ability to work an eight-hour-a-day job.

Further, the FCE's conclusion that Donovan could perform light work for eight hours a day is not substantial evidence of Donovan's ability to work full-time. It is unclear how long the FCE lasted. However, at the most, it lasted one day. According to Donovan, she was bedridden the next day due to pain as a result of the FCE. (R. 224-25 (Donovan Aff. ¶ 11).) Dr. Welshofer noted in his affidavit that "[a] Functional Capacity Evaluation such as has been undergone by Ms. Donovan in this particular matter is not an accurate indicator of her ability to work on a consistent basis or her disability." (Id. 314 (Dr. Welshofer Aff. ¶ 8).) Dr. Welshofer stated that the FCE does not measure the frequent and severe fatigue that Donovan experiences, and, further, Donovan has good days and bad days. (Id.) The Plan has offered no evidence that Donovan is a malingerer, and the court believes her to be credible. Further, the FCE states that Donovan exerted maximum and consistent effort. (Id. 320)

In addition, the Plan relies on Donovan's statements in the resource questionnaire and Eaton's long-term disability questionnaire that she can go to the grocery store, doctor's office, and church and that she can bathe herself, dress herself, and perform back exercises. (Id. 133-34, 150-53.) The Plan argues that her statements "demonstrate marked improvement in her abilities and mobilities, undermining her claim for continued LTD benefits." (Def.'s Reply 6.) While her statements may show improvement, Donovan's statements do not address

her ability to work. As such, the FCE and Donovan's statements are not substantial evidence that Donovan can work a full-time job.

Finally, the Plan argues that the peer reviews and the independent medical review support its decision to deny LTD benefits. In the case at bar, the peer reviews and the physician review were performed solely from the record without ever examining Donovan. Further, only Dr. Wallquist and the independent physician reviewer considered the most recent medical evidence, from July to September 2004, regarding Donovan's condition which required her to undergo a fifth back surgery. See Mitchell, 2005 WL 1793641, at *9 (finding that an independent medical examination performed "[w]ith an incomplete record and without any further tests . . . does not outweigh the medical opinions" of the claimant's treating physicians and peer reviewer). As such, the two peer reviews that are based on incomplete information are not entitled to as much weight as the opinions based upon a complete record.

The opinions of the final peer reviewer, Dr. Wallquist, and the independent medical reviewer are the only opinions based on complete information which allege that Donovan has not been continuously and totally disabled. In the opinion of Dr. Wallquist and the independent physician reviewer, Donovan's fifth back surgery was disabling. However, both found that she was not disabled from March to September 2004. (R. 71, 351.) Further, the independent medical reviewer opined that

> [Donovan] would have been disabled for a period of time following her surgery but it would appear, within the records, that within a four to six week period she would have been capable of returning to work with some limitations in her activities. At this point in time, there is no indication to suggest, based on her early follow up from her neck surgery, to suggest that she would be anything other than improved following the surgery and as such my opinion would be

14

>  maintained that she could return to work in a sedentary type duty on a full time employment.[3]

(Id. 71.)  The Plan argues that Donovan has not been continuously disabled because, as of March 1, 2004, there was substantial evidence that she was not disabled from any occupation. The Plan essentially argues that the medical evidence from July to September 2004 is irrelevant to its February 2004 denial of Donovan's LTD benefits because it was not known in February 2004.

The Plan's argument defies logic.  The Plan unreasonably disregarded Dr. Welshofer's affidavit and the medical regards regarding Donovan's condition from July 2004 through September 2004 in evaluating Donovan's LTD benefits claim.  Donovan's worsening condition was discovered in July 2004 during the appeals process.  However, the spinal canal stenosis, spinal cord compression, right median nerve entrapment in her wrist, and R C6 radiculopathy did not appear suddenly in July 2004.  (Id. 230-31.)  On July 1, 2004, Donovan reported to Dr. Welshofer that she was experiencing "worsening neck pain" and "pain all of the way down her right arm."  (Id. 340.)  Dr. Welshofer's examination revealed that she had radiating symptoms down her arm and paresthesias. (R. 340.)  In fact, after learning of Donovan's cervical back problems, Dr. Welshofer opined in an affidavit that Donovan is and has been totally disabled since 1993.  (Id. 314-15 (Dr. Welshofer Aff. ¶ 9).  Further, Dr. Lins stated in an August 2, 2004, office note that Donovan's neck and right arm pain had been getting worse over the previous six months, but that the pain had been present for the last

---

[3] The record is devoid of any evidence regarding Donovan's ability to work following her cervical back surgery.

three years.  (Id. 342.)  As Donovan's counsel points out, the Plan "ignore[s] the fact that [Donovan] clearly must have suffered from her significant problems which necessitated surgery before she actually had the surgery."  (Pl.'s Mem. Supp. J. 31.)

As discussed above, Eaton's decision to deny Donovan LTD benefits is unreasonable. Further, in light of Dr. Welshofer's affidavit and the medical evidence from July to September 2004, Eaton's decision is not supported by substantial evidence in the record.  Based on the foregoing, the court finds that Eaton abused its discretion in denying Donovan LTD benefits. As such, Eaton's denial of LTD benefits is reversed.

It is therefore

**ORDERED** that Eaton's decision denying Donovan LTD benefits is reversed. It is further

**ORDERED** that the Plan pay LTD benefits to Donovan.

**IT IS SO ORDERED**.


s/ Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
October 6, 2005